# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

SESCILY RENEE CONEY

Pro Se Plaintiff,

Case No.

-against-                                    **COMPLAINT**

THE TRUSTEES OF COLUMBIA              **Jury Trial Demanded**
UNIVERSITY IN THE CITY OF NEW YORK,
COLUMBIA UNIVERSITY SCHOOL OF
NURSING, NEW YORK-PRESBYTERIAN
HOSPITAL, DR. LORRAINE FRAZIER, in her
individual capacity; DR. CANDICE SMITH, in
her individual capacity; DR. HEIDI HAHN-
SCHROEDER, in her individual capacity; DR.
MARY HICKEY, in her individual capacity;
DR. ELLEN FAHEY, in her individual capacity;
AMANDA KOSTREVA, in her individual
capacity; AUDREY BROWN, in her individual
capacity; DAVID SELTZER, in his individual
capacity; DEIRDRE INGRAM, in her individual
capacity; DR. JEANNE CHURCHILL, in her
individual capacity; MADELINE GREEN, in
her individual capacity; EMILY FISHER, in her
individual capacity; SHULAMIT JUST-
MICHAEL, in her individual capacity

Defendants.

Plaintiff Sescily Renee Coney ("Plaintiff"), pro se, files this Complaint against Defendants The
Trustees of Columbia University in the City of New York ("Columbia University"), Columbia
University School of Nursing ("CUSON")  and together with Columbia University, ("Columbia"),
Dr. Lorraine Frazier ("Frazier"), Dr. Candice Smith ("Smith"), Dr. Heidi Hahn-Schroeder ("Hahn-
Schroeder"), Dr. Mary Hickey ("Hickey"), Dr. Ellen Fahey ("Fahey"), Amanda Kostreva
("Kostreva"), Audrey Brown ("Brown"), David Seltzer ("Seltzer"), Deirdre Ingram ("Ingram"),
Dr. Jeanne Churchill ("Churchill"), Madeline Green ("Green"), Emily Fisher ("Fisher"), Shulamit
Just-Michael ("Just-Michael") and alleges as follows:

## PRELIMINARY STATEMENT

1. Columbia, one of America's leading universities, has for decades been one of the worst centers of academic discrimination and retaliation in the United States.

2. Columbia's discrimination and retaliation manifest themselves in a double standard invidious to Black and disabled students. Columbia selectively enforces its policies to avoid protecting Black and disabled students from harassment, allows professors to engage in discriminatory and retaliatory conduct without accountability, and ignores Black and disabled students' pleas for protection.

3. Plaintiff has explicitly and repeatedly warned Columbia that its severe and pervasive hostile environment harms Black and disabled students. In fact, Columbia has been aware of its discrimination and retaliation problem for years, but its response has been, to say the least, utterly ineffective and clearly unreasonable in not just tolerating, but enabling, discrimination and retaliation. Columbia has abjectly failed to enforce its policies and discipline those responsible for turning Columbia's campus into a severely hostile environment for its Black and disabled students, including Plaintiff. When, in October and November 2024, in clear violation of Columbia's policies, members of Columbia's faculty and staff engaged in fraudulent, discriminatory, and misleading behaviors against Plaintiff, Columbia's response was not to remove or discipline them, but to enable them to continue creating false narratives about Plaintiff.

4. In short, Columbia has permitted intense discrimination and retaliation, including from its own faculty and administrators, to exclude Black and disabled students, including Plaintiff, from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Columbia, and has invidiously discriminated against Plaintiff by, among other things, failing to protect her in the same way Columbia has protected other groups—all based on their race, ethnicity, religion, disability, citizenship, and/or national origin. That Columbia has done so for many years and continues to do so to this day further confirms that it has responded to discrimination and retaliation with at best deliberate indifference, that Columbia cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

5. As alleged herein, Columbia's actions, including its deliberate indifference to, and enabled of, discrimination and retaliation on its campus, constitute an egregious violation of Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1972, and similar civil rights laws. Columbia's actions regarding Plaintiff's financial aid are also in violation of Health Resources and Services Administration's Nurse Corp Scholarship guidelines, US Department of Education guidelines, and other applicable codes and guidelines. Columbia must now be compelled to implement institutional, far-reaching, and concrete remedial measures. Columbia must also pay damages to Plaintiff, who has been robbed of her graduate school experience, and to compensate her for the hostility she has been forced to endure as a consequence of Columbia's unlawful conduct.

## THE PARTIES

6. Plaintiff Sescily Renee Coney is a Black, female, and disabled student at Columbia University and has attended CUSON since June 2024. She is in her final semester of the Masters of Direct Entry ("MDE") program. Plaintiff is federally funded HRSA Nurse Corp Scholar who also receives Title IV funds. She is the first student to receive the HRSA Nurse Corp Scholarship in the MDE program's history, which includes being the first Black, first female, and first disabled student. The HRSA Nurse Corp Scholarship is funded through the US Congress. Nursing school credits are not transferable. Plaintiff has a 3.25 GPA with 4 missing grades not accumulated or calculated into the GPA. **Summer II 2025 courses began on June 2, 2025. Plaintiff attended all of her classes unregistered during the first week of June 2, 2025. After being told that she could no longer engage in academic activities until registered, Plaintiff has missed the second week of classes. Summer II 2025 courses are 10 weeks long; Plaintiff is now down to just 8 weeks left of class.**

7. Defendant The Trustees of Columbia University in the City of New York is the legal name of Columbia University, a private not-for-profit university based in New York, New York. Columbia University is composed of various graduate and undergraduate constituent schools, including CUSON.

8. As of April 2025, Columbia University's endowment fund was valued at $14.8 billion. Columbia University accepts substantial direct financial assistance from the federal government through, among other things, grants and contracts. Columbia University also receives substantial indirect federal financial assistance through, among other things, tuition paid through federal financial aid. At all times relevant to this complaint, Columbia University was and continues to be subject to Title VI. Columbia University is also an "educational institution" and place of "public accommodation" under Title II and Title III of the ADA, Section 504 of the Rehabilitation Act, the New York State Human Rights Law, and the New York City Human Rights Law.

9. Defendant Columbia University School of Nursing is a private not-for-profit nursing institution in New York, New York. CUSON is an official graduate school of Columbia University.

10. Defendant New York-Presbyterian Hospital is a private, not-for-profit academic medical center and nursing institution located in New York, New York. It provides clinical training and educational opportunities for nursing students and partners with various academic institutions to support healthcare education and professional development.

11. Defendant Dr. Lorraine Frazier was at all times relevant herein the Dean of CUSON in New York, New York. She is sued in her individual capacity.

12. Defendant Dr. Candice Smtih was at all times relevant herein the Director of Clinical Placement at CUSON in New York, New York. She is issued in her individual capacity.

13. Defendant Dr. Heidi Hahn-Schroeder was at all times relevant herein the Assistant Dean of Academic Affairs and Program Director of the MDE Program at CUSON in New York, New York. She is sued in her individual capacity.

14. Defendant Dr. Mary Hickey was at all times relevant herein the Vice Dean of Education at CUSON in New York, New York. She is sued in her individual capacity.

15. Defendant Dr. Ellen Fahey was at all times relevant herein the Program Director of the Family Nurse Practitioner Program at CUSON in New York, New York. She is sued in her individual capacity.

16. Defendant Amanda Kostreva was at all times relevant herein the Assistant Director of Disability Services at Columbia in New York, New York. She is sued in her individual capacity.

17. Defendant Audrey Brown was at all times relevant herein the Associate Vice President of Student Financial Services at Columbia University in New York, New York. She is sued in her individual capacity.

18. Defendant David Seltzer was at all times relevant herein the Executive Director of Student Financial Services in New York, New York. He is sued in his individual capacity.

19. Defendant Deirdre Ingram was at all times relevant herein a Program Director at CUSON in New York, New York. She is sued in her individual capacity.

20. Defendant Dr. Jeanne Churchill was at all times relevant herein the professor of Science of Nursing with Children at CUSON in New York, New York. She is sued in her individual capacity.

21. Defendant Madeline Green was at all times relevant herein a clinical instructor of Nursing with Childbearing Families at CUSON in New York, New York. She is sued in her individual capacity.

22. Defendant Emily Fisher was at all times relevant herein a student at CUSON in New York, NY. She is sued in her individual capacity.

23. Defendant Shulamit Just-Michael was at all times relevant herein an employee of New York-Presbyterian Hospital in New York, NY. She is sued in her individual capacity.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over the subject matter of this action under 28 USC § 1331 and 1343 over claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 USC § 2000d *et seq.*), 42 U.S.C. § 1983, and 42 USC § 1986. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 USC § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

25. This Court has personal jurisdiction over Defendants because Defendants are based and operate in New York.

26. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391(b)(1) because the defendant resides in this district and all other defendants reside in this district or a district within this state. The judicial district in which as substantial part of the events or omissions giving rise to Plaintiff's claims occurred and where Columbia University and CUSON are located.

## FACTS

(a)    Title VI Protects Black Students Against Discrimination and Retaliation

27. Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance, and protects all students, including Black students, in such programs or activities.

28. Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education to investigate Title VI complaints against universities related to racism and discrimination. In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know or reasonably should have known," and stating that such harassment violates Title VI when it creates a "hostile environment" in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."

29. On May 4, 2024, the US Department of Education released a fact sheet, "Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics," which reiterated that Title VI prohibits "discrimination on the basis of race, color, or national origin in programs or activities that receive federal financial assistance. All educational institutions, including pre-K, elementary, and secondary public schools and school districts, and public and private colleges, universities, and other postsecondary institutions that receive federal financial assistance, are required to comply with Title VI." Discrimination includes harassment and hostile environment, which "may take the form of a single victim and multiple offenders".

(b)    Section 504 Protects Disabled Students Against Discrimination and Retaliation

30. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in any program or activity that receives federal funding or other federal financial assistance.

31. It states: no otherwise qualified individual with a disability in the United States, as defined in Section 7(20) [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

32. Retaliation claims under Section 504 are governed by the same standards as Title VI of the Civil Rights act of 1964. Courts have recognized that individuals who oppose disability discrimination or assist disabled individuals in vindicating their rights are protected from retaliation.

(b)    Columbia University and CUSON Fail to Enforce Their Own Policies to Protect Black Students

(i)    Columbia University's Policies

33. Columbia University has issued at least five applicable policies ostensibly to protect students from discrimination, harassment, retaliation, and intimidation: (i) Office of Institutional Equity Policies and Procedures; (ii) Rules of University Conduct; (iii) Non-Discrimination Statement and Policy; (iv) Standards and Discipline Policy; and (v) Faculty Handbook. Columbia University's clearly unreasonable response to discrimination, retaliation, and harassment, and its selective enforcement of its own rules, however, reflect a shameful double standard in its failure and refusal to apply these policies in a nondiscriminatory manner to protect Black students and prevent anti-Black sentiments on campus, deeming Black students unworthy of the protections Columbia University readily affords non-Black students.

(A)    Office of Institutional Equity Anti-Discrimination and Discriminatory Harassment Policies and Procedures for Faculty and Staff

34. Columbia University's Office of Institutional Equity ("OIE") is supposed to "prevent and respond to discrimination and harassment by developing and implementing policies and procedures [("OIE Policies & Procedures")] that address discrimination, harassment, the duty to report and the duty to act..." The OIE Anti-Discrimination and Discriminatory Harassment Policies and Procedures for Faculty and Staff states that "[Columbia University] does not tolerate discrimination, harassment…and all such conduct is forbidden by University Policy."

35. Under the OIE Anti-Discrimination and Discriminatory Harassment Policies and Procedures for Faculty and Staff, Columbia University "prohibits discrimination and harassment…on the basis of: …color; …disability; … gender (sex); …national origin; … race, …or any other protected characteristic as established by law." Harassment, "which is a form of discrimination," involves "[s]ubjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living

environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class."[1]

36. Under the OIE Anti-Discrimination and Discriminatory Harassment Policies and Procedures for Faculty and Staff, Columbia University "prohibits retaliation against individuals because they made a report to OIE or participated in any manner in the review of an incident report or an investigation or proceeding under Faculty and Staff ADDH Policies."[2] Retaliation can also include "threatening, intimidating, harassing, or any other conduct that would discourage a reasonable person from engaging in activity protected under the Faculty and Staff ADDH Policies, such as seeking services; receiving protective measures and accommodations; reporting misconduct; or participating in an investigation or adjudication" or "maliciously and purposefully interfering with, threatening, or damaging the academic or professional career of another individual, before, during or after the investigation and resolution of a report of misconduct under the Faculty and Staff ADDH Policies."

37. Under the OIE Anti-Discrimination and Discriminatory Harassment Policies and Procedures for Faculty and Staff, Columbia University "will provide reasonable accommodations to qualified individuals with a disability provided that the University knew or should have known of their disability, and that such accommodation does not constitute an undue hardship on the University."

(B) Rules of University Conduct

38. Columbia University's Rules of University Conduct provide that "[t]he University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study."

(C) Non-Discrimination Statement and Policy

39. Columbia University's Non-Discrimination Statement and Policy prohibits discrimination against any person on the basis of citizenship status, creed, national origin, disability, sex, gender, race, religion, or "any other applicable, legally protected status" in the administration of Columbia University's educational policies, programs, and functions.

(D) Standards and Discipline Policy

---

[1] Harassment can include: "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class."

[2] Retaliation is "any adverse action or threatened action, taken or made, personally or through a third party, against an individual (or group of individuals) because of their participation in any manner in the submission or review of a report, an investigation, or proceeding undertaken pursuant to the Faculty and Staff ADDH Policies, including individuals who file a third-person report and those who are interviewed or who otherwise provide evidence in the investigation (witnesses)."

40. Columbia University's Standards and Discipline Policy prohibits misconduct such as harassment and violation of Columbia University policies and law. It provides that students who interfere with "the ability of others to take advantage of the full complement of University life" will be subject to discipline.

(E)  Faculty Handbook

41. Columbia University's Faculty Handbook incorporates the OIE Policies and Procedures, the Non-Discrimination Statement and Policy, Ethical Conduct, Administrative Code of Conduct, and, among other things, directs that "Officers who serve in positions such as department chair, director of an institute or center, dean, or executive vice president, principal investigators on grants and contracts who serve in a supervisory capacity, and others who serve in managerial or supervisory roles, are responsible for taking reasonable and necessary action to prevent discrimination and harassment in the workplace and for responding promptly and thoroughly to such claims."

(ii)  CUSON's Policies

42. CUSON has issued at least two applicable policies ostensibly to protect students from discrimination, harassment, retaliation, and intimidation: (i) Non-Discrimination Policy and (ii) Code of Ethics.

(A)  Non-Discrimination Policy

43. CUSON's Non-Discrimination Policy prohibits unlawful discrimination and harassment and claims CUSON is committed to "fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members". Furthermore, CUSON's Non-Discrimination Policy mimics Columbia University's policy in that it prohibits discrimination against any person on the basis of citizenship status, creed, national origin, disability, sex, gender, race, religion, or "any other applicable, legally protected status" in the administration of Columbia University's educational policies, scholarship and loan programs, programs, and functions.

(B)  Code of Ethics and Professional Behavior

44. CUSON's Code of Ethics and Professional Behavior is a set of academic and professional standards that students are required to uphold as part of their educational and professional training. There are also requirements for instructors and faculty.

(c)  Columbia's History of Racism and Civil Rights Violations

(i)  Columbia Has Permitted and Fostered Racism and Discrimination for Years

45. Columbia has long cultivated and tolerated an institutional culture in which racism, discrimination, and retaliation are not only present but actively sustained through its policies, practices, and failure to hold wrongdoers accountable.

46. This culture extends to Columbia's treatment of students with disabilities, who are routinely denied equitable access to accommodations and subjected to heightened scrutiny and disciplinary action when seeking to assert their rights.

47. Rather than addressing complaints of racial bias, disability discrimination, or disparate treatment in good faith, Columbia's Board of Trustees and administration has consistently insulated its staff and faculty from consequences, thereby emboldening continued misconduct. Black student and other students of color with disabilities face compounded harm, often experiencing intersecting forms of discrimination in academic evaluations, clinical placements, and disciplinary procedures.

48. When these students speak out or attempt to seek redress, they are frequently met with indifference, institutional gaslighting, or retaliatory measures designed to silence or discredit them.

49. These patterns are not isolated or incidental—they are indicative of systemic failure and a willful disregard for civil rights, reflecting Columbia's ongoing unwillingness to dismantle the racial and ableist inequities embedded in its institutional framework.

> (ii)   Columbia's Discrimination is Exposed

50. Columbia's discrimination is not speculative—it is exposed through documented incidents, firsthand accounts, and Columbia's own records, which reveal gross disparities in how students of color and students with disabilities are treated.

51. For example, Black students in clinical rotations have been held to different standards than their White students, often receiving failing evaluations based on vague, subjective criteria—while White students who engage in comparable or worse conduct are allowed to progress without consequence.

52. Students with documented disabilities, including those registered with the Office of Disabilities Services, have been denied legally mandated accommodations or punished for using medically necessary assistive devices.

53. In contrast, non-disabled students have been observed using similar devices for non-medical reasons or engaging in comparable conduct without any disciplinary repercussions. Furthermore, when students raise concerns or file formal complaints, Columbia frequently responds not with resolutions but with retaliation—escalating disciplinary charges, altering academic standing, or retroactively reviewing footage or records to justify punitive actions.

54. These examples clearly expose Columbia's entrenched culture of discrimination and retaliation.

> (iii)   Columbia's Failure to Act Against Discrimination Emboldens Overt Discrimination on Campus

55. Columbia's failure to act against discrimination and retaliation has created an environment where such misconduct is not only tolerated but actively emboldened. By refusing to investigate complaints thoroughly, disregarding credible reports of bias, and shielding faculty and administrators from accountability, Columbia has sent a clear message that discrimination—particularly against Black students and students with disabilities—will go unpunished.

56. This institutional inaction has empowered individuals in positions of authority to engage in overt acts of bias, such as targeting students of color with harsher evaluations, denying accommodations to disabled students, or singling out those who file complaints for punitive treatment.

57. Instead of protecting students from harm, Columbia has enabled a retaliatory culture where speaking up results in further marginalization. This failure to act not only violates legal obligations under civil rights and disability laws but also fosters a hostile environment where discrimination flourishes unchecked.

    (iv)  Columbia Has History of Tampering with Financial Aid

58. Columbia has a documented history of tampering with financial aid, engaging in practices that have disproportionately harmed low-income and marginalized students.

59. In 2022, Columbia was among several elite universities named in a federal antitrust lawsuit alleging that they named in a federal antitrust lawsuit alleging that they colluded to limit financial aid and reduce institutional support to admitted students through a price-fixing cartel disguised as the 568 Presidents Group.

60. Although Columbia initially claimed to be need-blind, the lawsuit revealed that the university considered applicants' financial circumstances when making admissions decisions—contrary to its public representations.

61. More recently, in 2024, Columbia came under fire again for failing to distribute nearly $24 million in financial aid owed to students, sparking outrage and renewed scrutiny of its financial practices. Investigations and media coverage detailed how Columbia delayed or withheld federal and institutional aid without adequate explanation, leaving many students struggling with unpaid tuition bills, unmet living expenses, and the threat of disenrollment.

62. These financial mismanagement patterns have particularly affected students of color, first-generation college students, and those with disabilities—many of whom rely on timely aid to maintain housing, healthcare, and academic standing.

63. Columbia's repeated mishandling of aid funds not only reflects a disregard for its fiduciary responsibility but also reinforces systemic inequities by making it harder for marginalized students to succeed.

(a)    Plaintiff Is Being Denied Equal Access to Columbia's Educational Opportunities

64. The Plaintiff knows that, solely because of her Black and disabled identities, Columbia views and treats her as a second-class citizen, undeserving of the protections that Columbia affords non-Black and non-disabled students. Plaintiff has been deprived of the benefits that non-Black and non-disabled students enjoy in both academic and student life—all while paying, in addition to tuition, mandatory costly "student life fees," and other expenses.

65. Because of Columbia's persistent refusal to comply with its obligations to stop discrimination and harassment against Black and disabled students, Plaintiff is deprived of the benefits that non-Black and non-disabled students enjoy, including, but not limited to, emotional support; a sense of inclusion and belonging; participation in educational activities; and the ability to freely express her Black and disabled identity in class, written coursework, and on campus. Because of the hostile environment, Plaintiff has been, and continue to be, deprive of Columbia's full educational opportunities and offerings, including but not limited to the ability to register and attend class in Plaintiff's final semester and be a member of the incoming Doctor of Nursing Practice in Midwifery class in Fall 2025.

66. As a result of Columbia's actions and inactions alleged herein, Plaintiff is made to feel less important than, and is treated differently from, other non-Black and non-disabled students. Students and Columbia faculty are able to taunt, demonize, harass, intimidate, ostracize, and discriminate against Plaintiff with impunity.

67. Plaintiff fears the harassment, discrimination, and intimidation she faces, on any given day, from professors and CUSON leadership, who are supposed to teach and guide them.

68. As a result of Columbia's deliberate indifference to this hostile education environment, including its clearly unreasonable responses and failure to respond at all in some cases, to reported issues, Plaintiff is unable to focus, study, or perform her coursework to the best of her ability, thereby inhibiting her ability to maximize her Columbia education. Plaintiff has had to spend her time at Columbia enduring abuse and harassment and communicating with Columbia administrators in vain over discrimination and retaliation. She has been unable to focus on her coursework or otherwise enjoy her Columbia experience.

69. Columbia's unreasonable actions and inactions described above not only deprive Plaintiff of her right to the educational and extracurricular opportunities afford to other students, which have led and will continue to lead to academic, social, and professional consequences, and severely impact her health, mental well-being, and sense of security.

70. Everyone involved is White. It is scary how White people are overseeing and controlling the future of a Black female disabled student to her detriment. They are trying to destroy my life, my academic future, and my occupational future because of my skin color, my race, my gender, and my disability.

(ii)    CUSON Commits Disability Discrimination

71. Plaintiff is a student with disabilities. Plaintiff has been disabled for over 10 years now. Plaintiff's disabilities were being adequately managed before they were exacerbated through the incidents alleged above.

72. Hickey and other administrators at CUSON were aware of Plaintiff's disabilities and how they were exacerbated. Hickey nor the other administrators referred Plaintiff to the Office of Disability Services ("ODS").

73. On March 15, 2025, Plaintiff began the process of seeking academic accommodations.

74. On March 25, 2025, ODS sent Plaintiff an email confirming receipt of registration materials.

75. On March 28, 2025, Amanda Kostreva ("Kostreva"), Assistant Director of Disability Services at Columbia Health, sent an email to Plaintiff stating that Plaintiff's requested accommodations were temporarily granted. Plaintiff was under the impression that all the requested accommodations were temporarily granted and that the email discussed the environment she would be placed in.

76. On March 31, 2025, Plaintiff was taking her Peds final exam in the accommodations room. There were 8 students, including Plaintiff, and two exam proctors. Plaintiff was wearing a medically necessary heart monitor, which monitors for accelerated and decelerated heart rates, a physiological characteristic of her disabilities. This physiological characteristic was mentioned when Plaintiff requested accommodations.

77. Plaintiff also requested the ability to speak aloud while taking the exam, which is one of the requested accommodations.

78. During the exam, Plaintiff received two text messages from classmates who were not in the accommodations room. These two classmates were texting during their exam time. Plaintiff was not taking the exam at that time. The two classmates were asking where Plaintiff was and stated that Dr. Jeanne Churchill ("Churchill"), Peds professor, was looking for Plaintiff. Plaintiff stated that she was in the accommodations room.

79. Plaintiff had trouble gaining access to the final exam. Plaintiff was continuously getting access to the Psych exam, the class she was originally supposed to be taking. Plaintiff and the exam proctor went to get the technology fixed.

80. When coming back to the exam room, Plaintiff asked the proctor if she could be in a separate room because she speaks aloud and she would be starting the exam 30 minutes later than others. The exam proctor texted administrators, who told the proctor that they did not have any open rooms available and that the Plaintiff would be fine.

81. Plaintiff began the exam 30 minutes after the rest of her class.

82. Plaintiff was reading aloud per the accommodations she requested. The exam proctor asked Plaintiff to decrease the volume. Plaintiff was not shouting. Plaintiff complied. This happened twice.

83. The proctor asked Plaintiff if she was wearing a smartwatch. Plaintiff said yes. The smartwatch is the heart monitor. The proctor looked at the interface and saw that there was nothing on the interface. The proctor asked for Plaintiff to remove it, and Plaintiff complied. Plaintiff continued with her exam. The exam was never stopped, and administration never came to the testing area.

84. On April 2, 2025, Plaintiff received a notification on ExamSoft that she was scheduled to do a makeup of the Peds final on April 4, 2025, but Plaintiff never received any information about the request. Plaintiff assumed this was a glitch. Plaintiff would later discover that this was a premeditated occurrence from Churchill, who wanted Plaintiff to retake the exam prior to there being a complaint made.

85. On April 9, 2025, Plaintiff received notification that grades for the final exam were posted. Plaintiff did not receive a grade.

86. Plaintiff reached out to Churchill to inquire about the grade. The next day, Churchill stated that Plaintiff's grade was being withheld until the conclusion of the Center for Student Success and Intervention ("CSSI") investigation.

87. A CSSI investigation was initiated by Churchill because there was an allegation by the proctor that Plaintiff was using the heart monitor to receive answers. There was never any proof shown. This allegation was based on hearsay and no proof associating the proctor directly with making those allegations.

88. Dr. Jeanne Churchill, in direct violation of Columbia's Code of Ethics and her professional obligations as a faculty member, failed to initiate any conversation with Plaintiff to investigate or resolve the situation before escalating matters through formal disciplinary channels. Instead of affording Plaintiff the courtesy, fairness, and presumption of professionalism due to any student—especially one with a disability—Churchill bypassed all standard conflict resolution or fact-finding procedures and unilaterally accused Plaintiff of cheating during a high-stakes final exam, based on her use of a medically necessary heart monitor and permitted testing accommodations. Without any evidence of academic dishonesty and without conducting a preliminary inquiry, Churchill chose to weaponize the process by filing a formal CSSI (Center for Student Success and Intervention) complaint.

89. To support her fabricated claims, Churchill enlisted Deirdre Ingram, Program Director for the MDE Program, who contributed to this retaliatory effort by crafting a false and deeply ableist narrative about Plaintiff. Ingram described Plaintiff's disability-related behaviors—such as her need to sit near a wall for grounding and sensory regulation—as "very usual" and "suspicious," pathologizing what were, in fact, medically documented and previously disclosed symptoms

of disability. These movements were neither new nor unique to Plaintiff, and other students had sat near walls during exams without incident or scrutiny. Yet Ingram chose to racialize and criminalize Plaintiff's physical presence, presenting normal and reasonable disability-related behaviors as if they were evidence of deceit or misconduct.

90. Ingram's commentary sought to cast Plaintiff not as a student with rights, but as a threat—thereby reinforcing racialized stereotypes of Black women as disruptive, dishonest, or deviant. Ingram's choice of language and her reliance on subjective impressions, rather than facts or documented violations, demonstrate a disturbing lack of objectivity and a willingness to distort reality to justify discriminatory treatment. These actions were taken without giving Plaintiff any chance to explain her behavior, present her medical needs, or respond to the accusations. At no point did Churchill or Ingram acknowledge Plaintiff's status as a student with disabilities entitled to reasonable accommodations under the ADA or Section 504 of the Rehabilitation Act.

91. This collaborative effort between Churchill and Ingram was not rooted in legitimate academic concern but in retaliatory bias and institutional malpractice. Their actions contributed directly to the creation of a hostile educational environment in which Plaintiff's presence was treated as inherently suspect. Moreover, their failure to uphold procedural fairness, disability rights, and Columbia's own ethics guidelines highlights the pattern of abuse, exclusion, and misconduct that Plaintiff has endured from Columbia officials. In doing so, both Churchill and Ingram participated in the deliberate marginalization of a Black, disabled student for asserting her right to accommodations and access to education.

92. On April 11, 2025, Plaintiff had her orientation with Kostreva and ODS. This was the first time Plaintiff and Kostreva discussed accommodations and their need. Kostreva denied most of Plaintiff's accommodations. Kostreva stated that she felt as though Plaintiff did not need to speak aloud because those are accommodations reserved only for students with dyslexia. Kostreva also stated, at that time, that Plaintiff could not wear a heart monitor. When Plaintiff asked Kostreva if ODS had a heart monitor that Plaintiff could use to be monitored, Kostreva said no. Kostreva stated that Plaintiff would need to remove her heart monitor and place it in a bag in the front of the class. Kostreva stated that she did not realize that Plaintiff's physician denoted the elevated heart rate.

93. On April 25, 2025, Churchill released Plaintiff's final exam grade, which was a 77%. Churchill also released Plaintiff's course grade, which was an 83.

94. During this time, Plaintiff was preparing to enter her 6-week Integration course. Hickey prevented Plaintiff from partaking in the Integration course. For one, Hickey denied Plaintiff the right to participate in Integration because Hickey did not have details regarding Plaintiff's placement at mt. Sinai West. Secondly, Hickey stated that Plaintiff could not participate because of the pending CSSI investigation. CUSON's rules only stipulate that a student can participate in Integration if they have successfully completed previous semesters, which Plaintiff has.

95. On May 7, 2025, Plaintiff participated in the CSSI hearing. Plaintiff showed proof that no apps were opened or used, that she was monitoring her heart, and that two non-disabled students violated the process by having electronic devices during an exam but were not penalized. One was even allowed to travel abroad for Integration.

96. During this time, Plaintiff was attempting to have her other requested accommodations approved. Plaintiff provided documentation from her therapist for seven accommodation requests and recommendations. Those requests and recommendations, based on the therapist's knowledge and expertise are:

    (a)   Remote examinations for all classes;

    (b)   Ability to speak aloud during examinations and in classes;

    (c)   Flexibility with her deadlines;

    (d)   Private room for testing;

    (e)   Ability to monitor her heart rate on a smartwatch or a chest monitor;

    (f)   An aide (Dr. Stephné R. Coney, advocate) to accompany her to clinical sites; and

    (g)   Flexible timing to get to clinical sites.

97. Kostreva stated that she would not accept the documentation. Kostreva also stated that she shared Plaintiff's medical documentation with Dr. Melanie Bernitz, the Senior Vice President of Columbia Health without Plaintiff's knowledge and permission. Dr. Bernitz then rendered a medical opinion and diagnoses based on that documentation without meeting or speaking with Plaintiff.

98. On May 21, 2025, CSSI rendered their decision. CSSI stated that there were no finding of cheating or disruption. However, CSSI claimed that because Plaintiff had "access to an unfair advantage" by possessing her heart monitor and her speaking aloud "could be distracting," she was given Conditional Disciplinary Probation for violating the testing environment. Plaintiff was punished unfairly for her disability and for hypothetical situations that did not happen. Plaintiff submitted an appeal on May 28, 2025.

99. On May 23, 2025, during a short summer break, Churchill reached out to Plaintiff at 4pm, telling Plaintiff that she would have to retake the final exam within one business day, on May 28, 2025 at 9am. It would be one business day because Monday, May 26, 2025 was a holiday.

100.   Plaintiff informed Churchill that she had a doctor appointment on that day and that she was out of state. Churchill dismissed her concerns and stated that it was Plaintiff's duty and responsibility to return to New York City. If she did not, she would receive a zero.

101.   Plaintiff continued to ask for the exam to be rescheduled for Friday, May 30, 2025 so that Plaintiff could attend her doctor appointments and have time to return to New York City. Churchill continued to deny and pushed Plaintiff off to Kostreva.

102.    Plaintiff emailed Kostreva about having the exam pushed to May 30, 2025 due to her doctor appointments. Kostreva required Plaintiff to provide her with the name of the doctor, the address of the medical practice, and the time of the appointment for appointments set for May 28, 2025 and May 29, 2025. Plaintiff provided those.

103.    The exam date was moved to May 30, 2025. Plaintiff took the exam without incident.

104.    Plaintiff received her final exam grade on June 5, 2025. Plaintiff received an 89.43%.

(ii)    CUSON Commits Financial Retaliation

105.    Plaintiff is a nursing student who began her program in June 2024. She is enrolled in CUSON's Masters of Direct Entry (MDE) program, which is a 15-month pre-licensure program.

106.    In March 2024, Plaintiff applied for the Health Resources and Services Administration's Nurse Corp Scholarship. The Nurse Corp Scholarship provides scholarships to nursing students in exchange for a service commitment at an eligible health care facility. It is a federal award overseen by the US Department of Health and Human Services and funded by Congress. Each student enters into a contract signed by the Secretary of Health and Human Services and each accepting school is to abide by the rules of the award.

107.    In May 2024, Plaintiff applied for a federal student loan to cover her program. The loan was disbursed in June 2024, and she received a refund in July 2024.

108.    In September 2024, Plaintiff's Fall loan was disbursed, and she received a refund.

109.    In September 2024, Plaintiff was informed that she received the HRSA Nurse Corp Scholarship. Plaintiff informed CUSON of this honor on September 27, 2024. CUSON administration originally doubted that Plaintiff had received the scholarship, going as far as telling her that her acceptance needed to be verified by a third party. When it was verified that Plaintiff received the scholarship, Plaintiff was informed by CUSON that she was the first person, including the first Black student, in the MDE program to ever receive the award.

110.    Plaintiff received documentation from HRSA that would be given to CUSON. One of the documents was the 2024-25 School Financial Representative Welcome Letter. In this letter was an outline of how some funds would be distributed. In pertain part, the letter stated:

> The Nurse Corp SP is authorized to reimburse for loans. If a Nurse Corp Scholarship Program participant has taken out a student loan to cover the cost of tuition and required fees for the summer and/or fall semester(s), while waiting for notice of the Nurse Corps Scholarship Program award, the participant should request that their academic institution prepare an itemized invoice detailing the amount of tuition and required fees paid for the student loans to cover this period. The Nurse Corp Scholarship Program will pay the

amount of the invoice to the academic institution and **the school will reimburse the scholar.** (emphasis added)

111.    After Plaintiff informed CUSON about the HRSA Nurse Corp Scholarship, Plaintiff reached out to Columbia University's Student Financial Services ("SFS") to arrange for the invoices to be sent to HRSA. In October 2024, Plaintiff coordinated with Arthur Martin ("Martin"), Assistant Director of Third-Party Billing in SFS, to make sure the proper steps per HRSA guidelines were met. The invoices were sent in October 2024 to HRSA.

112.    The invoices had to be resent again to HRSA in December 2024 by Martin.

113.    HRSA submitted payment of the invoices in December 2024. At this point, CUSON has double payment.

114.    Plaintiff's account had a zero balance. When the HRSA payment came in, because of the HRSA policy and guidelines, Martin manually processed the reimbursement to Plaintiff in December 2024 using the loan funds that HRSA had replaced. Martin "reimbursed the scholar" as per HRSA guidelines. This manual reimbursement shows that Columbia recognized that HRSA replaced the loans and the funds were now owed to Plaintiff, not the lender. A manual reimbursement is also one that is not automatic nor routine; it requires direct human action and judgment. Martin had to enter into Columbia's internal financial system and manually input the transaction. The transaction was deliberate.

115.    Due to Martin's position, it is likely that Martin required approval from upper management to fulfill this obligation or at least coordinate with other agencies. In essence, it appears that Martin verified that HRSA funds has been received and posted to Plaintiff's account, confirmed that Plaintiff has a loan disbursed for those two terms, confirm that the reimbursement matched HRSA's "reimburse the scholar" guideline, possibly get approval from a supervisor or compliance officer, and then manually reimbursed Plaintiff.

116.    Columbia University did not object to the manual reimbursement.

117.    Martin stated that he manually reimbursed Plaintiff because the funds received would get mixed into the Spring 2025 semester costs because the billing for that semester would be coming out in a few days.

118.    According to HRSA guidelines, if HRSA pays after a loan was used, the student—not the loan company—should be reimbursed for those costs. This is the "reimburse the scholar" guideline.

119.    On January 14, 2025, CUSON sent an email to HRSA recipients and stated that if the student wanted CUSON to return their federal loans in its entirety, they needed to respond to an email. Plaintiff did not respond. If the student does not want to return the loan, the student

keeps the loan and follows the usual repayment schedule with their lender. This email, which also mentioned an adjustment, was beyond 120 days of each loan disbursement.

120.    Columbia claimed to have returned federal loans more than 120 days after disbursement, while interest continued to accrue against Plaintiff. There was no documentation of return provided by Columbia nor was disbursement reversal or authorization provided by Plaintiff, which is a violation of 34 CFR 668.165. As of January 1, 2025, interest was accruing on the loans. In February 2025, Plaintiff received a deferment statement, which means that Plaintiff does not have to pay loans until after six months post-graduation.

121.    Plaintiff—a Black disabled student—was told to retrieve this proof on her own. This represents not only financial negligence on Columbia's part, but an active obstruction of her right to contest a debt and access protected educational resources.

122.    CUSON cannot unilaterally send federal loans back to the lender without the borrower's consent nor can there be a claim that money is owed without proof.

123.    On January 23, 2025, CUSON stated that Plaintiff had to return the manually reimbursed funds to cover a balance that CUSON created. This is 229 days from the disbursement of the June 8, 2024 Summer loan disbursement and 134 days from the September 11, 2024 Fall loan date. This is also 6 weeks from the time that Plaintiff received the manual reimbursement from Martin.

124.    CUSON claimed they returned the federal loan, but did not provide Plaintiff with notice, the amount returned, the return date, the transaction confirmation, nor did they seek her consent. CUSON also did not submit a *Return to Lender* form. If there was a return, there should be a notice from MOHELA, the loan lender, and a change in the National Student Loan Data System.

125.    The loans from the Summer 2024 and Fall 2024 semesters were disbursed over 120 days and CUSON could not return the loans to the lender on Plaintiff's behalf. Plaintiff as the borrower must be consulted before any return of any funds per US Department of Education guidance through the FSA Handbook. Any funds returned after 120 days of disbursement accrue interest and Plaintiff is legally obligated to pay back the funds. Once a loan disbursement is over 120 days old, it is considered a fully accepted and finalized disbursement. Any return after 120 days is considered a repayment, not a cancellation.

126.    If CUSON did not return the loans and the excess funds were given to Plaintiff as a reimbursement, which is following HRSA guidelines, CUSON cannot state that Plaintiff owes the money because CUSON still retains the funds.

127.    It appears that CUSON kept HRSA funds and loan funds, which would mean that Plaintiff is not responsible.

128.    On February 24, 2025, Plaintiff met with Hickey and administrators regarding the student account. Plaintiff explained the HRSA guideline of "reimburse the scholar". The administrator stated that the funds were automatically given to Plaintiff because there was a credit on Plaintiff's account. The administrator and Hickey never stated that Martin manually and deliberately reimbursed Plaintiff based on the HRSA guidelines. It was as if the administrator blamed a computer to cover their shift in position.

129.    Throughout this period, Plaintiff attempted to receive guidance from HRSA, MOHELA, Federal Student Aid, and members of Congress.

130.    On May 8, 2025, Plaintiff met with Audrey Brown ("Brown"), Associate Vice President of SFS, and David Seltzer ("Seltzer"), Executive Director of SFS.

131.    During this conversation, Brown stated that Plaintiff was overawarded.

132.    Friday, June 6, 2025 was the deadline for registration. On June 6, 2025 at 5:01pm, Brown emailed Plaintiff a financial ultimatum and ransom—Plaintiff could either pay $10,000 and go on a monthly plan to gain access to registration OR Plaintiff would have to pay over $28,000 to gain access to registration. This appears to be financial retaliation, policy abuse, abuse of power, and extortion.

        (ii)    CUSON Commits Academic Retaliation

133.    From October 2024-November 2024, Plaintiff took part in her Nursing with Childbearing Families ("OB") rotation at Alexander Cohen Hospital for Women and Children ("Cohen"). She was one of 8 students in her group. The group met at Cohen every Wednesday and Thursday for five weeks. The clinical instructor was Defendant Madeline Green ("Green"). The course instructor was Defendant Dr. Candice Smith ("Smith"). Green and Smith are White women.

134.    On October 31, 2024, Plaintiff was running late to Cohen. She informed Green that she would be late and Green did not comment. Four other students stated that they, too, were running late, and Green did not make any comment. When Plaintiff arrived at Cohen, Green did not make any statement or comment about the lateness. This was Plaintiff's first time being late to OB.

135.    Plaintiff was assigned to the Neonatal Intensive Care Unit ("NICU") for the day. Plaintiff was assigned to a nurse. Green was not on the floor, which is a violation of CUSON policy.

136.    When the nurse was completed her tasks, the nurse told Plaintiff to find something to do. Plaintiff saw her classmate, Defendant Emily Fisher ("Fisher"), with Nurse A and asked if she could tag along. The nurse and Fisher said yes. Fisher is a White student at CUSON.

137.    While with Nurse A and Fisher, Plaintiff entered the room of Patient 1. After Nurse A finished feeding Patient 1, Nurse A placed Patient 1 in Fisher's arms and left Patient 1 with Fisher and Plaintiff. While Fisher was holding Patient 1, Patient 1 began having trouble breathing due to the way Fisher had Patient 1 positioned, causing the alarm bells to go off and two nurses to rush into the room. The nurses readjusted Patient 1 in Fisher's arms, checked to make sure Patient 1 was no longer having breathing complications, and left the room again. Plaintiff was not holding Patient 1.

138.    After some time, Fisher and Plaintiff left the room. Nurse A stated that she did not have anything for them to do at that point. Plaintiff found the original nurse she was assigned to and helped this nurse hand out Halloween costumes to the parents of the patients.

139.    When Plaintiff was completed that task, she and Fisher were waved down by a parent. The parent asked for them to come into the room and assist her with placing the Halloween costume on a patient, Patient 2.

140.    Plaintiff held onto the costume while Fisher assisted the parent with undressing Patient 2 and putting on a diaper.

141.    Once Fisher and parent were complete, Fisher and Plaintiff jointly attempted to see if they could assist the parent with her request of placing the costume on Patient 2.

142.    Plaintiff and Fisher noticed that Patient 2 was connected to a respirator, a cardiac monitor, and a feeding syringe. Plaintiff and Fisher had been trained in all of the apparatuses used. At no point did Plaintiff remove or discard any of the apparatuses. Jointly, Plaintiff and Fisher did place a cap on the end of a connection to the feeding syringe pump, but only after doing their safety checks as trained. Patient 2 was not harmed or in any way in danger.

143.    Plaintiff and Fisher determined that they could not place the costume on Patient 2 due to the apparatuses and asked nurses for assistance.

144.    The nurses entered, looked at the apparatuses, stated that Plaintiff and Fisher did a good job, and the nurses changed Patient 2 into the costume. Once that was complete, Plaintiff and Fisher left the room with the nurses.

145.    There was a time in between where Plaintiff did not have anything to do. Plaintiff did not enter any rooms alone. Fisher was in rooms alone with patients and changing their diapers.

146.    At some point, Plaintiff found Nurse A in Patient 1's room again doing a feeding. While conducting the feeding, Fisher also came into the room. Nurse A asked Plaintiff if she would like to hold Patient 1 and Plaintiff stated that she would. Nurse A placed Patient 1 in Plaintiff's arms and left the room. At no point was Plaintiff alone.

147.    While holding Patient 1, Plaintiff thought that Patient 1 had urinated in the diaper. Plaintiff and Fisher placed Patient 1 in a bassinet and noticed that Patient 1 did urinate in the diaper. Plaintiff and Fisher began looking for diapers and cleaning material.

148.    Suddenly, a loud bang was heard at the opening of the room. Plaintiff jumped in front of Patient 1's bassinet in protection. A woman, later identified as Defendant Shulamit Just-Michael ("Just-Michael") entered abruptly, startling Plaintiff. Just-Michael is a White woman and an employee of New York-Presbyterian Hospital.

149.    Just-Michael exclaimed that Plaintiff and Fisher should not be in the room and that they—meaning Plaintiff and Fisher—are placing their---meaning the nurses—licenses in jeopardy. Just-Michael motioned for Plaintiff and Fisher to move.

150.    Plaintiff explained that Nurse A left them in the room and that Nurse A knew where they were. Just-Michael continued to berate Plaintiff and Fisher. Nurse A came into the room and stated that it was fine if Plaintiff and Fisher were going to change the diaper. Plaintiff continued to reiterate that Nurse A knew they were present in the room.

151.    Plaintiff explained to Just-Michael that Just-Michael's approach was startling. Just-Michael left. Shortly thereafter, Plaintiff and Fisher left. Plaintiff and Fisher went to a post-conference with Green and their fellow members of their cohort. Other members of the cohort expressed having the ability to do things independently. Neither Plaintiff nor Fisher provided details of Just-Michael's behavior during post-conference. Post-conference continued without incident.

152.    Later that day, around 3pm, Plaintiff had a scheduled Zoom call with Smith. Smith expressed concerns because two assignments—a midterm self-evaluation that has no point value and another assignment, the Concept Map—were uploaded late. Plaintiff explained that the mid-term self-evaluation was completed and signed by both Plaintiff and Green, but Plaintiff was experiencing technical issues. Plaintiff further explained that she had technical issues with the uploading of the Concept Map and included this explanation when it was uploaded.

153.    Smith stated that she did not think Plaintiff was taking this seriously and that she was going to teach her a lesson. This baffled Plaintiff.

154.    Smith then asked about the "incident at the end of the day". Plaintiff explained about the situation with Fisher, Just-Michael, and Nurse A. Smith sounded shocked that Plaintiff was not alone. She stated that she would look into the situation.

155.    On November 1, 2024, Plaintiff received an email from Smith accusing Plaintiff of "disconnecting a feeding tube and moving a baby's oxygen to apply a Halloween costume while alone with the baby." Smith stated that Plaintiff was earning a failing grade. Smith with

Defendant Dr. Heidi Hahn-Schroeder ("Hahn-Schroeder") then placed Plaintiff on an action plan.

156.    Plaintiff attempted to meet with Smith, Hahn-Schroeder, Green, Fisher, Just-Michael, and her representative altogether in order to address the false allegations. That meeting was declined. Plaintiff was asked by Hahn-Schroeder to meet and when Plaintiff accepted the meeting, but asked that I have my representative present, the meeting was declined by Hahn-Schroeder.

157.    Plaintiff reached out to Fisher who, among other things, confirmed that Plaintiff was not alone with any patient. Fisher admitted that Plaintiff did not move any heart monitor, respirator, or feeding tube. Fisher admitted that she was with patients alone and changed their diapers by herself. Fisher admitted that Plaintiff nor Fisher changed Patient 2's Halloween costume. Fisher admitted that she and Plaintiff did not change Patient 1's diaper. Fisher admitted that Just-Michael was aggressive when speaking with her and Plaintiff. Fisher admitted that every student in their clinical cohort had been late to clinical and that Green, as the instructor, had also been late. Fisher stated that she would be willing to assist with this matter. This conversation was recorded.

158.    Plaintiff returned to Cohen on Wednesday, November 6, 2024 and November 7, 2024 without incident.

159.    Plaintiff was scheduled to meet with an administrator on Monday, November 11, 2024, but was unable to meet because Plaintiff was ill.

160.    Smith requested to meet with Plaintiff on Monday, November 11, 2024, but was informed that Plaintiff was ill. Plaintiff's representative stated that they would like to reschedule.

161.    On November 12, 2024, in retaliation for Plaintiff being ill, made the determination to give Plaintiff an F for OB without due process or speaking with Plaintiff. Smith claimed that the F was given because of safety issues and lateness. Smith then stated that Plaintiff "demonstrate[s] a lack of transparency, accountability, and necessary competence as a student nurse." Smith barred Plaintiff from attending clinical for a new course, Nursing with Children ("Peds").

162.    Smith never spoke to Plaintiff about the allegations nor requested a statement from Plaintiff, and instead took the words of White women as fact. Plaintiff was denied due process. Smith provided racially charged rhetoric, targeting the historic stereotype of Black women as dangerous caregivers. Smith attempted to sabotage Plaintiff's career through outward writing that was done with reckless disregard, not based on fact, but designed to justify removing Plaintiff from clinicals two weeks after the alleged acts.

163.    Plaintiff reached out to Fisher, who informed Plaintiff that she was not barred from attending clinical for Peds.

164.    On November 13, 2024, Plaintiff met with a CUSON administrator to begin the grievance process.

165.    On November 13, 2024, Plaintiff reached out to Fisher to see if she would write a statement for Plaintiff's grievance. Fisher stated that she would be happy to meet with Smith but was "uncomfortable" doing anything more at the moment. There were allegations that Smith and Hahn-Schroeder had approached Fisher and informed her to not talk as a protective measure for Fisher.

166.    On November 14, 2024, the Committee on Admissions, sent from Dr. Mary Hickey ("Hickey"), a White woman, formally withdrew Plaintiff from CUSON based on Smith's giving Plaintiff an F.

167.    The same day, Hickey responded that Plaintiff was allowed to attend the virtual courses but was barred from attending the Peds clinical AND the Peds lecture course.

168.    On December 4, 2024, Plaintiff had her grievance hearing. The grievance hearing was attended by more people than the policy allowed. Plaintiff was to receive her grievance decision within 24 hours.

169.    On December 6, 2024, outside of the 24-hour window, Plaintiff received her grievance decision. Plaintiff was told from an administrator and Hickey that the grievance panel decided to retain the F for OB, but Plaintiff could remain in the program. Plaintiff would be required to complete the OB clinical again. Plaintiff asked Hickey if she would be permitted to return to the Peds lecture and clinical. Hickey stated, "Absolutely not." Plaintiff was baffled because Fisher, the White student, was allowed to continue her education without interruption. Fisher was not banned or barred from Peds clinical or lecture. Fisher was allowed to go into the Pediatric Intensive Care Unit.

170.    On or about December 11, 2024, Plaintiff submitted an appeal of the grievance panel's decision. Plaintiff was not allowed, at that time, to view the documents submitted by Smith, Green, or Hahn-Schroeder, which were used in opposition of Plaintiff during the grievance hearing.

171.    Around this time, an administrator withdrew Plaintiff from the Peds course without Plaintiff's consent or knowledge. Hahn-Schroeder signed the Add/Drop form without Plaintiff's signature and processed the document.

172.    On December 18, 2024, a week after the appeal was due, Plaintiff was allowed to view the documents used during the grievance hearing. The documents showed, among other things, that the grievance panel initially voted to give Plaintiff a Pass, but Dr. Ellen Fahey ("Fahey"), a White woman and the Program Director of the Family Nurse Practitioner program, seemed adamant to have Plaintiff punished. It should be noted that Fisher was admitted into the Family Nurse Practitioner program once she completed the MDE program.

173. In the documents, there is no mention of Fisher, the recorded confession that was provided to the grievance panel, or the discrimination that was raised by Plaintiff.

174. Plaintiff was not allowed to receive a copy of the documents for her records.

175. On January 6, 2025, Plaintiff received an email from Dr. Lorraine Frazier ("Frazier"), the Dean of the School of Nursing and a White woman, stating that she overruled the grievance panel and would be giving Plaintiff a Low Pass instead of an F. There was no mention of the discrimination that was raised by Plaintiff and there were no actions taken to address the concerns.

176. On January 20, 2025, Plaintiff met with Hickey and her representative to discuss program options, which either meant a delay in completion with full completion in Fall 2025 and degree conferral in February 2026 or an overload during the end of Spring 2025 into Summer 2025 with normal completion in August 2025. Plaintiff picked the latter.

177. On January 21, 2025, Plaintiff was purposely excluded from emails for her clinical cohort, which detailed meeting locations and times for meeting. Plaintiff received those emails later than the rest of her clinical cohort. If Plaintiff had not received the emails, she would have been listed as "late" or even received another F.

178. In February 2025, Plaintiff informed Hickey and another administrator that students were approaching Plaintiff with allegations and rumors that Plaintiff tried to kill a baby. Hickey did nothing.

179. In February 2025, Plaintiff was scheduled to be in Science of Psych/Mental Health ("Psych"). Plaintiff was told by Hickey and administration that she would have to drop out of that class and take Peds instead. Plaintiff would then have to take Psych at an accelerated pace, i.e. in 3 weeks versus in 5 weeks.

180. In March 2025, Smith approached Plaintiff during her Peds clinical. Plaintiff was sitting at the nurses' station when Smith approached Plaintiff in an uncomfortable manner where Smith leaned over the ledge and said that she just wanted to see what Plaintiff was doing. Considering Smith was the same individual who falsely accused Plaintiff of breaching safety and attempting to harm babies, this behavior appeared to be seeking more unjustified accusations, especially in the realm of working with children.

181. Fisher was permitted to complete all her courses in her given sequence and in her given timeline. Plaintiff was not. Fisher was never deemed to have posed a safety risk even though Plaintiff was blamed for things that Fisher did, i.e. being alone with patients and changing diapers. Fisher was never told that she was incompetence or not transparent like how Plaintiff, the Black female disabled student, was told.

182.    Plaintiff participated in CUSON's commencement on May 20, 2025 and had the option of participating in the Columbia-wide commencement on May 21, 2025. Plaintiff is, essentially, a graduate of the CUSON nursing program. The commencement program lists her as being graduated and conferred in October 2025.

183.    Fisher was also celebrated and acknowledged during commencement for the honors or awards she received. Plaintiff, being the first ever MDE student to receive the HRSA Nurse Corp Scholarship, was not acknowledged nor celebrated.

184.    On May 28, 2025, Hickey along with Fahey, Hahn-Schroeder and others decided to retroactively place Plaintiff on academic probation, which would be in place for the entirety of Summer 2025. Hickey claims that the academic probation is for the Low Pass that was given by Frazier in January 2025. Per policy, the Committee on Admissions evaluates students at the end of each sub-term or term. Normally, the Committee on Admissions meets every 5 weeks. This would mean that Plaintiff should have been notified of the academic probation in either January, February, March, April, or early May.

185.    Placing Plaintiff on academic probation also means that Plaintiff was removed from the Doctor of Nursing Practice ("DNP") in Midwifery program with just 3 months until the start date. The Low Pass was given in January 2025. Plaintiff received a 2025 Articulation Form in February 2025, which is for students who are currently admitted into the DNP program. Furthermore, CUSON had a period for internal applications for students who would like to apply for the DNP internally or for those students who lost their spot in the DNP program and would like to reapply. By delaying the academic probation, Hickey, Smith, Hahn-Schroeder, Fahey, and others purposely denied me the opportunity to attempt to be readmitted.

186.    On June 12, 2025, in the late afternoon, Plaintiff was given another ultimatum—she would either have to request to be registered by Defendant Hahn-Schroeder as the Program Director, take a Leave of Absence to be requested by Monday, June 16, 2025, or be forcefully withdrawn from the institution. Plaintiff has been asking to be registered but has been adamantly denied by Hickey and another dean, who is following Hickey's advice and lead. **Plaintiff has active institutional, state, and federal complaints against Hahn-Schroeder, who will be making the determination if Plaintiff can be enrolled.**

187.    At this point, Plaintiff will either be financially in ruins, have her academics delayed, be unable to complete her degree in a timely fashion, or be withdrawn from the program and lose her scholarship.

## <u>COUNT 1</u>

### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

### Against ALL Defendants

188. Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

189. Columbia University and CUSON receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

190. Discrimination against Black students—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI.

191. Plaintiff identifies as Black, and her status and identification as Black brings her within the scope of Title VI's protections. Plaintiff is currently enrolled in CUSON in her final semester of the program. Her credits are not transferable.

192. Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part because of her ancestry, race, ethnic characteristics, or national origin.

193. The acts and omissions of Columbia and its administrators have subjected Plaintiff, and continues to subject Plaintiff to discrimination and harassment on the basis of her actual and/or perceived shared Black/African American ancestry, race, ethnic characteristics, or national origin.

194. Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia has and has substantial control and the authority to remedy, was and continues to be so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on her Black/African American ancestry, race, ethnic characteristics, or national origin that deprives Plaintiff of full access to Columbia's educational programs, activities, and opportunities.

195. Defendants intentionally discriminate against Plaintiff on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin, as exhibited by Defendants' deliberate indifference to the discriminatory abuse, harassment, retaliation, and intimidation of Plaintiff in violation of Title VI. Specifically, Defendants clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff and the hostile environment that she is forced to endure at Columbia because of her Black/African American ancestry, race, ethnic characteristics, or national origin. Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment, discrimination, retaliation, and intimidation from recurring. Such unlawful deliberate indifference caused and causes Plaintiff to be subject to a hostile educational environment.

196. The environment at Columbia, which has been rendered hostile for Plaintiff as a result of her Black/African American ancestry, race, ethnic characteristics, or national origin, is

sufficiently severe, pervasive, persistent, and offensive such that it deprives Plaintiff of equal access to the educational opportunities and benefits that Columbia provides to non-Black students.

197.    Defendants actively and intentionally engage in this pattern of severe and pervasive discrimination.

198.    Defendants also directly and intentionally discriminate against Plaintiff, with her actual or perceived Black/African American ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Columbia's actions.

199.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving discrimination against Plaintiff. As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat Plaintiff as compared to other similarly situated non-Black students.

200.    Defendants' acts and omissions are the actual, direct, and proximate causes of Plaintiff's injuries.

201.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages in amounts to be determined at trial.

202.    Plaintiff has been and will continue to be injured because Defendants have and will continue to deny her equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against her on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin.

203.    Plaintiff is entitled to injunctive relief under Title VI, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia and other Defendants from continuing to discriminate against Plaintiff on the basis of Black/African American ancestry, race, ethnic characteristics, or national origin; and the harm Plaintiff will otherwise continue to suffer is irreparable.

204.    Plaintiff is entitled to fees and cost pursuant to 42 USC 1988.


## COUNT 2

### (New York Executive Law (Human Rights Law) § 296 et seq.)

### Against ALL Defendants

205.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

206.    Educational institutions like Columbia are prohibited, under New York Executive Law § 296, from discriminating against or permitting the harassment of students, even in part because of their actual or perceived race, religion, national origin (defined to include "ancestry"), citizenship, or immigration status.

207.    Plaintiff's identify as Black, and her status and identification as Black brings her within the scope of Executive Law § 296's protections.  Plaintiff is a student currently enrolled in Columbia.

208.    The acts and omissions of Columbia and its administrators have subjected Plaintiff, and continues to subject Plaintiff, to discrimination and harassment on the basis of her actual and/or perceived shared Black/African American ancestry, race, or national origin.

209.    Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia has and has substantial control and the authority to remedy, was and continues to be so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on her race or national origin that deprives Plaintiff of full access to Columbia's educational programs, activities, and opportunities.

210.    Defendants intentionally discriminate against Plaintiff on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin, as exhibited by Defendants' deliberate indifference to the discriminatory abuse, harassment, retaliation, and intimidation of Plaintiff in violation of Executive Law § 296. Specifically, Defendants clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff and the hostile environment that she is forced to endure at Columbia because of her race. Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment, discrimination, retaliation, and intimidation from recurring. Such unlawful deliberate indifference caused and causes Plaintiff to be subject to a hostile educational environment.

211.    The environment at Columbia, which has been rendered hostile for Plaintiff as a result of her Black/African American ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives Plaintiff of equal access to the educational opportunities and benefits that Columbia provides to non-Black students.

212.    Defendants actively and intentionally engage in this pattern of severe and pervasive discrimination.

213.    Defendants also directly and intentionally discriminate against Plaintiff, with her actual or perceived Black/African American ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Columbia's actions.

214.    Defendants' actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Plaintiff as a Black student.

215.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving discrimination against Plaintiff. As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat Plaintiff as compared to other similarly situated non-Black students.

216.    Defendants' acts and omissions are the actual, direct, and proximate causes of Plaintiff's injuries.

217.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

218.    Defendants' actions and omissions toward Plaintiff amount to willful or wanton negligence, recklessness, and/or conscious disregard of the rights of others.

219.    Plaintiff has been and will continue to be injured because Defendants have and will continue to deny her equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against her on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin.

220.    Plaintiff is entitled to injunctive relief under New York Executive Law § 296, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia and other Defendants from continuing to discriminate against Plaintiff on the basis of Black/African American ancestry, race, or national origin in violation of New York Executive Law § 296; and the harm Plaintiff will otherwise continue to suffer is irreparable.

221.    Plaintiff is entitled to fees and cost pursuant to N.Y. Exec. Law § 297(10).

## COUNT 3
### (New York Civil Rights Law § 40-c)
### Against ALL Defendants

222.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

223.    New York Human Rights Law § 291 provides that the opportunity to obtain education and use places of public accommodation, such as Columbia, without discrimination because of race, creed, or national origin is a civil right.

224.    New York Civil Rights Law § 40-c ("NYCRL") prohibits Columbia from subjecting Black students to discrimination or harassment—including based on their actual or perceived race, creed, or national origin.

225.    Plaintiff is and identifies as Black, and her status and identification as Black brings her within the scope of NYCRL's protections. Plaintiff is a student currently enrolled at CUSON.

226.    The acts and omissions of Columbia and its administrators have subjected Plaintiff, and continues to subject Plaintiff, to discrimination and harassment on the basis of her actual and/or perceived shared Black/African American race or national origin.

227.    Columbia and its administrators had and have actual notice that such discrimination and harassment, over which Columbia has and has substantial control and the authority to remedy, was and continues to be so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on her Black/African American race or national origin that deprives Plaintiff of full access to Columbia's educational programs, activities, and opportunities.

228.    Defendants intentionally discriminate against Plaintiff on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin, as exhibited by Defendants' deliberate indifference to the discriminatory abuse, harassment, retaliation, and intimidation of Plaintiff in violation of NYCRL. Specifically, Defendants clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff and the hostile environment that she is forced to endure at Columbia because of her race or national origin. Additionally, Columbia continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment, discrimination, retaliation, and intimidation from recurring. Such unlawful deliberate indifference caused and causes Plaintiff to be subject to a hostile educational environment.

229.    The environment at Columbia, which has been rendered hostile for Plaintiff as a result of her Black/African American race or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives Plaintiff of equal access to the educational opportunities and benefits that Columbia provides to non-Black students.

230.    Defendants actively and intentionally engage in this pattern of severe and pervasive discrimination.

231.    Defendants also directly and intentionally discriminate against Plaintiff, with her actual or perceived Black/African American race or national origin a substantial or motivating factor in Columbia's actions.

232.    Defendants' actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Plaintiff as a Black student.

233.    Columbia continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving discrimination against Plaintiff. As detailed above, Columbia's actions, inactions, and conduct were, and continue to be, intended to treat Plaintiff as compared to other similarly situated non-Black students.

234.    Defendants' acts and omissions are the actual, direct, and proximate causes of Plaintiff's injuries.

235.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer substantial damages and are entitled to statutory damages of $500 per violation pursuant to NYCRL § 40-d.

236.    Plaintiff has been and will continue to be injured because Defendants have and will continue to deny her equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against her on the basis of her Black/African American race or national origin.

237.    Plaintiff is entitled to injunctive relief under NYCRL, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia and other Defendants from continuing to discriminate against Plaintiff on the basis of Black/African American race or national origin; and the harm Plaintiff will otherwise continue to suffer is irreparable.


## COUNT 4

### (New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(4), (17))

### Against ALL Defendants

238.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

239.    New York City Admin. Code § 8-107(4) prohibits Columbia from subjecting Black students to discrimination or harassment—including based on actual or perceived race or national origin.

240.    The acts and omissions of Columbia and its administrators and other employees have subjected Plaintiff, and continues to subject Plaintiff, to discrimination and harassment on the basis of her actual and/or perceived shared Black/African American race or national origin. Columbia has refused, withheld from, and denied Plaintiff the full and equal enjoyment, on equal terms and condition, of Columbia's accommodations, advantages, services, facilities or privileges, in violation of NYC Admin. Code § 8-107(4), including by treating her less favorably than similarly situated non-Black students based on her protected characteristcs.

241.    Defendants' actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Plaintiff as a Black student.

242.    Defendants' acts and omissions are the actual, direct, and proximate causes of Plaintiff's injuries.

243.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

244.    Defendants' actions and omissions toward Plaintiff amount to willful or wanton negligence, recklessness, and/or conscious disregard of the rights of others.

245.    Plaintiff has been and will continue to be injured because Defendants have and will continue to deny her equal access to the educational opportunities and benefits provided to other students, and have and will continue to intentionally discriminate against her on the basis of her Black/African American ancestry, race, ethnic characteristics, or national origin.

246.    Plaintiff is entitled to injunctive relief under New York Executive Law § 296, because Columbia has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Columbia and other Defendants from continuing to discriminate against Plaintiff on the basis of Black/African American race or national origin; and the harm Plaintiff will otherwise continue to suffer is irreparable.

247.    By this action, Plaintiff seeks to vindicate the public interest by enforcing fundamental state civil rights protections for students, including students who face discrimination and harassment at school based on their actual or perceived race or national origin.

248.    Plaintiff has complied with the procedural requirements of N.Y.C. Admin. Code § 8-502 by serving notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

249.    Plaintiff is entitled to fees and costs pursuant to  N.Y.C. Admin. Code § 8-502(g).

## **COUNT 5**

**(Breach of Contract)**

**Against ALL Defendants**

250.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

251.    At all relevant times, an implied and/or express contractual relationship existed between Columbia and Plaintiff by virtue of her enrollment at Columbia and as defined by and through Columbia codes, policies, and procedures, including, but not limited to, Columbia University's OIE Policies and Procedures, Rules of University Conduct, Non-Discrimination Statement and Policy, and Faculty Handbook. Through the documents and materials it publishes and provides to students, Columbia University makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

252.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

253.    Plaintiff complied with her obligations under these contracts.

254.    Columbia breached its agreements with Plaintiff, and failed to comply with its obligations under these contracts, throughout the course of her enrollment at Columbia, including by, among other things, failing to comply with the following provisions, among others:

- Columbia University is committed to providing a learning, living, and working environment free from prohibited discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members."  (OIE Policies & Procedures);

- "Harassment may include, but is not limited to: verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class."  (*Id.*);

- "All employees . . . have an obligation to immediately report harassment [and] discrimination." (Id.);

- "The University prohibits any form of discrimination against any person on the basis of . . . citizenship status; . . . creed; . . . national origin;. . . race; religion; . . . or any other applicable, legally protected status in the administration of its educational policies, admissions policies, employment, scholarship and loan programs, and athletic and other University-administered programs and functions." (Non-Discrimination Statement and Policy);

255. Columbia has also breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Plaintiff. Among other things, Columbia University selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, or national origin bias—treating incidents of abuse, harassment, intimidation, or discrimination against Black students, including Plaintiff, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

256. As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## COUNT 6

### (New York General Business Law §§ 349, 350)

### Against ALL Defendants

257. Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

258. Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. Section 350 similarly prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

259. Columbia's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of Columbia. These statements include those reflected, embodied, and set forth in Columbia's: promotional materials, official website, financial aid and admissions communications, student handbook, course catalogs, disability accommodation policies, diversity and inclusion statements, and communications regarding academic integrity and student conduct. Columbia represented itself as an institution committed to equity, inclusion, accessibility, and support for all students, including students of color and those with disabilities. These representations were materially misleading, as Columbia's actual practices—including its failure to equitably administer accommodations, its disparate treatment of Black students, and its mishandling of financial aid—directly contradicted those public assurances. As a result, Plaintiff relied on Columbia's deceptive and

misleading statements when choosing to apply, enroll, and remain at the university, thereby suffering concrete educational, financial, emotional, and professional harm.

260. Columbia has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, and has instead knowingly engaged in the following false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances:

(a) Representing itself as an institution committed to diversity, equity, and inclusion, while permitting and protecting discriminatory conduct by faculty, administrators, and staff, particularly toward Black students and students with disabilities;

(b) Publicizing commitments to accessibility and accommodation while routinely denying or failing to implement legally required accommodations, including those supported by documentation and medical necessity;

(c) Claiming to offer need-blind admissions and equitable financial aid processes while actively participating in schemes that manipulate financial aid awards and withhold funds, including nearly $24 million in aid reportedly delayed or mishandled in 2024;

(d) Promoting a safe, supportive, and fair academic environment while engaging in retaliation against students who file complaints, raise concerns, or assert their rights under disability and anti-discrimination laws; and

(e) Marketing itself as a place of academic excellence and student-centered support while disproportionately subjecting marginalized students to academic probation, dismissal threats, and fabricated or exaggerated allegations of misconduct. These practices are not only materially misleading but also inflict real harm on students who rely on Columbia's public statements when making critical decisions about their education and future.

261. By falsely leading Plaintiff to believe that Columba would apply, enforce, and follow the rules and policies, and the commitments contained therein, reflected, embodied, and set forth in Columbia's student handbooks, non-discrimination statements, disability services protocols, Title IX policies, faculty manuals, and public-facing statements on diversity, equity, and inclusion, Columbia engaged in materially deceptive conduct. Plaintiff relied on these representations in choosing to enroll, remain enrolled, and pursue her degree at Columbia, with the reasonable expectation that the university would uphold its contractual, legal, and ethical obligations. Instead, Columbia selectively enforced its policies in a discriminatory and retaliatory manner, disregarded Plaintiff's disability accommodations, failed to investigate credible complaints of bias, and imposed arbitrary disciplinary measures—contrary to its published commitments. These false assurances caused Plaintiff to suffer significant educational, financial, professional, and emotional harm, and constitute a breach of trust and a violation of consumer protection laws designed to guard against such institutional misconduct.

262. By falsely causing Plaintiff to believe that if she paid tuition and fees to Columbia, then Columbia would uphold, adhere to, abide by, and comply with its stated rules and policies, and

the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnic characteristics, national origin, or disability could freely express their identity, could learn and grow, and could participate fully and meaningfully in Columbia's educational and other programs.

263.    Plaintiff saw, heard, and was aware if Columbia's false and misleading statements and representations described above before they enrolled at Columbia and after they were enrolled in Columbia.

264.    Columbia's false and misleading statements and practices described above caused Plaintiff injury by causing her to enroll at Columbia, and to pay tuition and fees to Columbia, and to continue to maintain enrollment at Columbia and continue to pay tuition and fees to Columbia, based on the reasonable understanding that Columbia would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation, and discrimination based on their ancestry, race, ethnic characteristics, national origin, or disability, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implements measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  Columbia did not take such actions.

265.    Columbia's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused Plaintiff to sustain actual damages and not obtain the benefit of her bargain with Columbia, including the loss of the value of the tuition and fees she has paid to Columbia, extreme emotion distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

266.    Accordingly, Plaintiff is entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on Columbia University's willful or knowing violations.

267.    Plaintiff is entitled to fees and costs pursuant to General Business Law § 349(h).

### **COUNT 7**

### **(42 U.S.C. § 1986)**

### **Against ALL Defendants**

268.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

269.    Black/African Americans are a protected class for the purposes of 42 U.S.C. § 1986.

270.    Defendants engaged in an anti-civil rights conspiracy within the meaning of 42 U.S.C. § 1985(3), which was discriminatory and threatening, and which created a hostile and discriminatory environment for Plaintiff.

271.    Defendants plotted, coordinated, and executed a common plan with an agreement and understanding to engaged in, promote, and encourage harassment, retaliation, discrimination, and intimidation against Plaintiff.

272.    This meeting of the minds is evidenced in the close collaboration among Defendants.

273.    In furtherance of a conspiracy to violate the rights of Plaintiff, as set forth in the paragraphs above, Defendants committed numerous overt acts designed to create an environment of intimidation and verbal harassment, and hostility against Plaintiff for the purpose of depriving her of her constitutional rights to the equal protection of the laws and her equal enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, and to the full and equal benefit of the laws and proceedings for the security of persons, including those under 42 U.S.C. §§ 1981 and 1982, the Thirteenth Amendment right to be free from racial discrimination, because of her ancestry, national origin, race, or ethnicity.

274.    Defendants committed numerous overt actions in furtherance of this unlawful conspiracy to engage in, promote, and encourage racial, ethnicity-based, and disability-based harassment, including but not limited to withdrawing Plaintiff from the nursing program based on inaccurate information; giving Plaintiff a low passing grade for actions in line with other students; tampering with Plaintiff's financial aid and scholarship award; condemning Plaintiff for the use of a medically necessary heart monitor leading to a disciplinary sanction; removing Plaintiff's acceptance into the Doctor of Nursing Practice in Midwifery program; and attempting to force Plaintiff to withdraw by holding her education for ransom.

275.    Plaintiff has faced harassment, had her classes and other educational opportunities disrupted, have been blocked from engaging in academic activities, and have been prevented from completing her program due to financial mismanagement.

276.    The actions of Defendants violate 42 U.S.C. § 1985(3).

277.    Columbia possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this Complaint that was planned and undertaken against Plaintiff.

278.    This knowledge came through multiple reports by Plaintiff to Columbia's administration through emails and other correspondence. Plaintiff requested assistance and even meetings with Columbia administration to address these issues and to take action, but Columbia refused to help.

279.    Columbia has direct oversight and disciplinary power over Defendants who committed the Section 1985 violations. Columbia did not take any disciplinary action against any individuals in connection with the actions detailed in the Complaint and Defendant continued to engage in and take overt acts in furtherance of the conspiracy described herein. Columbia's actions were not reasonably diligent in preventing the acts in furtherance of the conspiracy.

280.    Although Columbia had the power to intervene and prevent violations of Plaintiff's civil rights as a Black female disabled student, Columbia neglected and/or refused to prevent or aid in preventing the commission of this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to the stop the above-described injuries that occurred to Plaintiff, a Black female disabled student, who was the target of the anti-civil rights conspiracy described above.

281.    Plaintiff suffered her injuries as a result of Columbia's failure to stop the described conspiracy.


## COUNT 8

### (Americans with Disabilities Act)

### Against ALL Defendants

282.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

283.    At all relevant times, Plaintiff was a qualified individual with a disability under the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 et seq., and met the essential eligibility requirements for participation in Columbia University's academic programs with or without reasonable accommodations.

284.    Defendants, including Columbia University and its agents, employees, and officials, are subject to the mandates of the ADA as recipients of federal funding and as operators of places of public accommodation and public education.

285.    Columbia failed and refused to provide Plaintiff with reasonable accommodations as required by law, despite Plaintiff's timely disclosures, supporting documentation, and consistent engagement with the Office of Disability Services. Plaintiff's medically necessary accommodations—including the use of a smartwatch to monitor heart rate during high-stress

exams, access to remote testing, and protections against triggering disciplinary procedures—were either ignored, delayed, revoked, or selectively enforced without justification.

286.    Columbia not only denied Plaintiff's accommodations but retaliated against Plaintiff for requesting and attempting to use those accommodations, subjecting her to increased scrutiny, academic sanctions, and procedural irregularities. These retaliatory actions included launching a retroactive investigation into past exams without notice, mischaracterizing Plaintiff's disability-related conduct as misconduct, and using the disciplinary process as a pretext to undermine her academic standing.

287.    Columbia's refusal to permit the use of a medically necessary heart monitor during examinations constitutes a direct violation of the ADA's modification requirement. Plaintiff has a documented heart condition requiring real time monitoring. The use of a silent, medically approved heart monitor/smartwatch poses no threat to academic integrity or program structure.

288.    Columbia's enforcement of a blanket electronics policy, without individualized consideration or effort to provide a reasonable modification, resulted in unjustified discipline, academic exclusion, and reputational harm. Columbia has failed to demonstrate any legitimate reason why the modification would fundamentally alter its educational services.

289.    Columbia's faculty and administrative staff acted with deliberate indifference toward Plaintiff's rights under the ADA. Rather than engage in an interactive process or seek reasonable resolution, Defendants punished Plaintiff for asserting her rights and failed to remediate discriminatory treatment she faced in clinical evaluations and classroom settings due to her disability.

290.    Just as Columbia must permit insulin pumps, glucose sensors, and Bluetooth-enabled medical devices for students with diabetes, they are federally obligated to permit my use for a medically approved smartwatch used for a real-time heart monitoring under the same ADA standards.

291.    Defendants further enabled and perpetuated a hostile academic environment, wherein Plaintiff's disability was met with skepticism, ridicule, and punitive treatment, while similarly situated students without disabilities—particularly white students—received more favorable treatment and were not subjected to equivalent sanctions.

292.    Columbia caused financial issues for Plaintiff by returned either Plaintiff's Direct PLUS Loan or the HRSA Nurse Corp Scholarship funds without prior notice or consent, resulting in a financial hold that blocked her from registering for courses. This action occurred despite Plaintiff's documented disabilities, her eligibility for federal financial support, and ongoing legal complaints and investigations involving ADA and Section 504 violations.

293.    Instead of making reasonable modifications to its financial aid procedures, such as allowing continued registration pending resolution, offering a financial hardship plan, or seeking

clarification from Plaintiff, Columbia applied a rigid, punitive policy that directly harmed Plaintiff's access to education.

294.    Columbia failed to consider the necessity of maintaining educational access for a disabled HRSA scholar facing active discrimination and retaliation. Whether the returned funds were from her Direct PLUS Loan or HRSA award, Columbia's actions reflect a willful disregard for federal protections and procedural equity.

295.    Columbia's actions and omissions constitute unlawful discrimination on the basis of disability, in violation of Title II and Title III of the ADA, and demonstrate a pattern of systemic failure to comply with federal disability law.

296.    As a direct and proximate result of Defendants' violations of the ADA, Plaintiff has suffered irreparable harm, including educational setbacks, emotional distress, reputational damage, financial hardship, and the loss of future career opportunities in both nursing and legal professions.

297.    Plaintiff seeks declaratory and injunctive relief, compensatory damages, attorneys' fees and costs, and any other relief the Court deems just and proper to remedy the continuing harms caused by Defendants' violations of the Americans with Disabilities Act.

298.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 9

### (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)

### Against ALL Defendants

299.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

300.    Plaintiff is an individual with disabilities.

301.    Plaintiff is otherwise qualified for participation in Columbia's programs.

302.    Plaintiff meets the academic and other requirements for admission, continuation, and participation in Columbia's educational programs.

303.    Columbia receives federal financial assistance.

304.    Columbia receives federal funding for its educational programs and activities.

305.    Plaintiff was denied the benefits of or subjected to discrimination by Defendants solely by reason of her disability.

306.    Plaintiff was falsely accused of academic dishonesty, disciplinary breach, and disruption for managing her disability.

307.    Columbia has instituted a blanket policy regarding electronic devices without making any reasonable modifications, which adversely affected Plaintiff.

308.    Plaintiff was considered "very unusual," mocked, mimicked, surveilled, and described harshly, and this ableist and discriminatory language was used as a basic for a false complaint made against Plaintiff.

309.    Columbia selectively enforced its policies to avoid protecting disabled students from harassment and ignored their pleas for protection.

310.    Just as Columbia must permit insulin pumps, glucose sensors, and Bluetooth-enabled medical devices for students with diabetes, they are federally obligated to permit my use for a medically approved smartwatch used for a real-time heart monitoring under the same Section 504 standards.

311.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

312.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.


## <u>COUNT 10</u>

### (Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g)

### Against ALL Defendants

313.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

314.    Under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, students have the right to privacy with respect to their education records and the right to be notified and consent to the disclosure of such records.

315.    Defendants, including Columbia University and its staff and administrators, violated FERPA by improperly accessing, reviewing, and using Plaintiff's academic records, disability documentation, and video surveillance footage without proper notice or consent, and in retaliation for Plaintiff's prior complaints and accommodation requests.

316.    Defendants failed to safeguard Plaintiff's records and used private educational and medical information—obtained under the guise of accommodation and educational support—as evidence in bad faith disciplinary proceedings, in direct contravention of FERPA's protections.

317.    Defendant Columbia University allowed its administrators to call Plaintiff's loan servicer using Plaintiff's personal identifying information to obtain information on Plaintiff's account without Plaintiff's consent or knowledge.

318.    Furthermore, Defendants failed to provide Plaintiff with timely access to her records upon request, withheld relevant documentation, and did not allow for proper amendment or dispute of inaccuracies, as required by law.

319.    These violations resulted in substantial harm to Plaintiff's academic standing, reputation, and career trajectory, and were done with willful disregard for Plaintiff's federally protected privacy rights.

320.    Plaintiff seeks appropriate relief, including declaratory judgment, compensatory damages, and injunctive relief to prevent further violations of FERPA.

321.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 11

### (Title IV – 34 C.F.R. § 685.202)

### Against ALL Defendants

322.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

323.    Columbia University participates in the Title IV federal student aid programs and, as such, is required to adhere to all federal regulations, including 34 C.F.R. § 685.202, which governs the proper use and administration of Direct Loan funds, including disbursement schedules, student notifications, and use of funds solely for educational purposes.

324.    Defendants violated these regulations by delaying, withholding, and mismanaging Plaintiff's federal financial aid and student loan disbursements. These funds were either not

disbursed in a timely manner or were used to coerce Plaintiff into compliance with discriminatory academic decisions, violating both the letter and spirit of Title IV protections. This act of coercion, referred to by Plaintiff as "educational ransom," was imposed in the context of ongoing federal civil rights complaints and disability accommodation disputes.

325.    Despite the existence of active investigations by HRSA, the US Department of Education, and civil rights enforcement agencies, Defendant Audrey Brown knowingly enforced a policy that denied Plaintiff the opportunity to register for classes. This occurred even after financial aid had already manually disbursed by Mr. Martin—another university financial officer—demonstrating that Columbia's claim of an "automatic refund" was false and misleading.

326.    Plaintiff relied on timely disbursement of these federal funds to cover tuition, housing, transportation, books, and essential living costs. The University's failure to disburse or release funds as required caused significant financial hardship and interfered with Plaintiff's ability to attend classes, complete clinical hours, and maintain satisfactory academic progress.

327.    By mishandling Title IV funds and misrepresenting Plaintiff's financial standing, Defendants further subjected her to undue stress, public embarrassment, and economic instability.

328.    Plaintiff seeks restitution, injunctive relief, and all other damages available under federal law to remedy these violations.

329.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 12

### (Nurse Corps Scholarship Program Statute – 42 U.S.C. § 297n)

### Against ALL Defendants

330.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

331.    Plaintiff is a recipient of the Health Resources and Services Administration (HRSA) Nurse Corps Scholarship, a federally funded program under 42 U.S.C. § 297n, which mandates that educational institutions cooperate fully with program requirements, including ensuring students are not penalized, retaliated against, or denied support based on participation in the scholarship.

332.    Columbia University and its agents interfered with Plaintiff's ability to meet the terms of the Nurse Corps Scholarship by failing to provide required clinical support, removing her from

rotations under false pretenses, and jeopardizing her academic progress—placing her in danger of defaulting on her service commitment through no fault of her own.

333.    Furthermore, Columbia's failure to disburse federal funds in accordance with HRSA guidance and its failure to notify HRSA of these issues violates the statutory and contractual duties owed to both HRSA and the Plaintiff.

334.    Columbia returned either Plaintiff's Direct PLUS Loan or the HRSA Nurse Corp Scholarship funds without prior notice or consent, resulting in a financial hold that blocked her from registering for courses. This action occurred despite Plaintiff's documented disabilities, her eligibility for federal financial support, and ongoing legal complaints and investigations involving ADA and Section 504 violations.

335.    These violations not only jeopardized Plaintiff's scholarship standing but also exposed her to long-term financial and legal consequences, including forced repayment of funds due to institutional misconduct rather than personal default.

336.    Plaintiff seeks full relief under the law, including declaratory and injunctive relief, monetary damages, and coordination with HRSA to restore Plaintiff's standing in the program and prevent further harm.

337.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.


## <u>COUNT 13</u>

### (Violation of Procedural and Substantive Due Process Rights, New York Constitution (Art. I § 6), Education Law § 310, § 3214, and § 3205)

### Against ALL Defendants

338.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

339.    Defendants, acting under color of state and/or institutional authority, deprived Plaintiff of protected liberty and property interests—namely, her education, reputation, financial aid, and career opportunities—without due process of law, in violation of the Fourteenth Amendment and relevant federal and state protections.

340.    Plaintiff was subjected to arbitrary disciplinary proceedings, impartial adjudication, and inconsistent application of institutional rules. Plaintiff was also denied the right to review or challenge key evidence used against her, including video surveillance, and was misled regarding the scope and implications of the proceedings.

341.    Defendants' actions were not only procedurally deficient but substantively unjustified, resting on discriminatory and retaliatory motives that rendered the entire process unconstitutional and void of legitimacy.

342.    As a result of these due process violations, Plaintiff suffered reputational harm, financial hardship, mental distress, and damage to her educational and professional trajectory.

343.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 14

### (Defamation of Character, New York Civil Rights Law § 76–79)

### Against ALL Defendants

344.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

345.    Defendants made false and defamatory statements about Plaintiff, both orally and in writing, to individuals inside and outside Columbia, including other faculty members, administrative offices, and potentially third-party organizations.

346.    These statements falsely implied that Plaintiff was dishonest, unprofessional, untrustworthy, and unfit for the nursing profession, and were made with actual malice, reckless disregard for the truth, or gross negligence.

347.    The defamatory statements have severely harmed Plaintiff's personal and professional reputation and have caused irreparable damage to her standing in the academic and healthcare communities.

348.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 15

### (Bullying, NY Educ. Law Art. 2 (§§ 10–18))

### Against ALL Defendants

349.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

350.    Defendants engaged in a persistent pattern of targeted harassment and intimidation toward Plaintiff, including verbal hostility, exclusion, punitive academic treatment, and retaliatory conduct following the assertion of her civil rights.

351.    This bullying created a hostile and psychologically unsafe educational environment that interfered with Plaintiff's right to learn, perform, and thrive.

352.    Defendants' behavior exceeded the bounds of legitimate academic conduct and constituted abuse of power, authority, and discretion.

353.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 16

### (Hazing)

### Against ALL Defendants

354.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

355.    Defendants subjected Plaintiff to humiliating, isolating, and degrading treatment under the guise of professional training, mentorship, or academic evaluation. This treatment included singling her out for harsh feedback, public embarrassment, and unreasonable demands not placed on similarly situated students.

356.    These actions meet the criteria of hazing under applicable institutional and state definitions, even if they occurred in non-fraternal or non-athletic contexts, and were intended to assert dominance and control under threat of academic penalty or exclusion.

357.    As a result of this hazing, Plaintiff experienced emotional distress, academic harm, and further alienation from peers and support systems.

358.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 17

### (Extortion (Coercive Threats Tied to Educational Status), New York Penal Law § 155.05– 155.08)

**Against ALL Defendants**

359.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

360.    Defendants engaged in coercive conduct amounting to extortion by threatening Plaintiff with academic dismissal, disciplinary action, and the withholding of financial aid unless she acquiesced to unlawful demands, including remaining silent about discrimination, refraining from filing complaints, or waiving legal protections.

361.    These threats were intended to extract compliance under duress, and Plaintiff's educational rights were weaponized to control her actions unlawfully and unethically.

362.    As a result of the foregoing, Plaintiff has suffered, and is continuing to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

## COUNT 18

**(Extortion (Withholding of Aid and Access), New York Penal Law § 155.05–155.08)**

**Against ALL Defendants**

363.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

364.    In a separate and compounding act of extortion, Defendants withheld essential financial aid, access to courses, clinical rotations, and records, using those denials as leverage to manipulate Plaintiff's conduct and suppress her complaints of discrimination and retaliation.

365.    These actions were not rooted in any legitimate academic basis and were driven by a desire to punish and intimidate Plaintiff for asserting her civil and disability rights.

## COUNT 19

**(Retaliation in Violation of 42 USCS § 12203)**

**Against ALL Defendants**

366.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

367.    Plaintiff engaged in protected activity.

368.    Plaintiff complained about the discrimination and harassment faced by Black and disabled students at Columbia, especially the discrimination and harassment she has experienced.

369.    **Plaintiff has complained internally to OIE, the Provost's Office, the Board of Trustees, and the Office of the President, and externally to the US Department of Education, US Department of Justice, HRSA, the New York Attorney General's Office, the New York State Human Rights Commission, the Middle States Commission on Higher Education, members of the US Senate and House of Representatives, members of the State Senate and Assembly, and others. Plaintiff has active complaints and investigations with these entities.**

370.    Defendants took adverse action against Plaintiff.

371.    After Plaintiff's complaints, Plaintiff experienced dysfunction with financial aid, being denied participation in the academic coursework, being denied the opportunity to enroll in the DNP program, being placed on academic probation, being denied the accommodations requested by Plaintiff and her medical team, being falsely accused of cheating due to having a medical device, being surveilled, being mocked and mimicked, and being told that she cannot register for her final semester.

372.    There is a casual connection between the protected activity and the adverse action.

373.    The adverse actions occurred after Plaintiff's complaints and were directly related to Plaintiff's efforts to address discrimination and harassment.

374.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged, and continues to sustain substantial damages, in amounts to be determined at trial.

## COUNT 20

### (Title IX)

### Against ALL Defendants

375.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

376.    Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

377.    Defendants, including Columbia University and its agents and administrators, receive federal funding and are subject to the obligations and prohibitions of Title IX.

378.    Plaintiff, a Black woman and nursing student, was subjected to discrimination on the basis of sex and gender, including but not limited to: disparate enforcement of academic policies, exclusion from clinical training opportunities, unjustified academic sanctions, denial of accommodations typically granted to other students, and retaliatory measures that impaired her educational access and advancement.

379.    Plaintiff was treated less favorably than her male and/or non-Black female counterparts. Male students and white female students were permitted to make up missed coursework, permitted to proceed with incomplete assignments without being placed on probation, and were not publicly demeaned or threatened with removal from the program.

380.    Plaintiff also experienced a hostile educational environment created by Columbia's administrators and faculty. She was repeatedly denied access to required academic resources, subjected to unfounded allegations of misconduct, and shamed in front of peers—all of which culminated in academic and reputational harm. These actions were not isolated incidents but part of a broader pattern of sex-based and intersectional discrimination.

381.    Further, Columbia failed to adopt and enforce adequate procedures to prevent and remedy sex-based discrimination and retaliation, thereby violating its obligations under Title IX. This includes its failure to meaningfully investigate Plaintiff's grievances regarding differential treatment and its failure to remedy ongoing disparate impacts even after being put on notice.

382.    Title IX also prohibits retaliation against individuals who complain of or oppose discriminatory practices. Plaintiff's reports of discrimination and her requests for equitable treatment and accommodations triggered a series of retaliatory actions by Defendants, including but not limited to: denial of enrollment, downgrading of academic records, financial penalties, and threats of dismissal from the program. These retaliatory acts constitute an additional, independent violation of Title IX.

383.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to: denial of educational access, loss of scholarship funds, reputational damage, emotional distress, and impairment of career opportunities in the nursing profession.

384.    Plaintiff is entitled to injunctive relief, damages, and any other relief available under Title IX to redress the harm caused by Defendants' unlawful conduct.

385.    The adverse actions occurred after Plaintiff's complaints and were directly related to Plaintiff's efforts to address discrimination and harassment.

386.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged, and continues to sustain substantial damages, in amounts to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all issues so triable.

## EMERGENT AND URGENT EX PARTE APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

387.    Plaintiff realleges and incorporates by reference its allegations in the preceding paragraphs as though fully set forth herein.

388.    Defendants' actions—specifically, their refusal to allow Plaintiff to register for her final semester, their intentional withholding of financial aid disbursements, and their retaliatory efforts to force Plaintiff to withdraw from the nursing program—constitute an unlawful deprivation of Plaintiff's property and liberty interests in her education. These acts are not only unjustified but constitute a deliberate and punitive campaign to undermine Plaintiff's academic progress and professional future, despite her good academic standing and compliance with programmatic requirements. This has caused and continues to cause Plaintiff irreparable harm as nursing school credits are not transferable.

389.    Unless this Court issues immediate injunctive relief, Plaintiff will suffer irreparable harm. This includes the inability to complete her Summer II coursework, forced delays in graduating, loss of her Fall 2025 admission to the Doctor of Nursing Practice in Midwifery program, and permanent damage to her academic record and reputation. The impact of these actions extends beyond education: it threatens Plaintiff's future licensure, employment opportunities, and access to federally funded programs such as the HRSA Nurse Corps Scholarship— jeopardizing her entire career trajectory.

390.    Plaintiff has no adequate remedy at law. Monetary damages cannot compensate for the lost opportunity to complete her degree on time, regain her reputation, or restore her access to critical funding and educational advancement. Time is of the essence; every day of delay exacerbates the harm and makes it increasingly difficult for Plaintiff to meet scholarship requirements, clinical placement deadlines, and professional obligations tied to timely completion.

391.    Plaintiff therefore respectfully requests a prohibitory injunction ordering Defendants to: (1) immediately remove the financial hold on Plaintiff's account; (2) permit her full registration and enrollment in the Summer II 2025 term without penalty; (3) reinstate her admission to the Fall 2025 Doctor of Nursing Practice in Midwifery program; (4) reinstate the "Excused" status

previously granted for the Integration course; (5) remove the "Low Pass" from Plaintiff's transcript; and (6) lift the improperly imposed academic probation.

392.    Plaintiff's Application for an Emergency Temporary Restraining Order and Preliminary Injunction is supported by her Memorandum of Points and Authorities, and the exhibits and supporting declarations attached thereto, which is being filed contemporaneously with this Original Complaint and Application and is incorporated herein by reference.

393.    Given the imminent and irreparable harm Plaintiff will suffer and has suffered—including the closure of registration and risk of forfeiting her clinical and scholarship opportunities— Plaintiff respectfully requests that the Court expedite the briefing schedule and grant this emergent Ex Parte Application for a Temporary Restraining Order immediately. Thereafter, Plaintiff requests that the Court set a prompt hearing on the issuance of a Preliminary Injunction to maintain the status quo and protect Plaintiff's rights during the pendency of this action. Further delay will also result in the forfeiture of scholarship eligibility, clinical placement, and licensure prerequisites. Providing Defendants with notice before issuance of the Temporary Restraining Order would likely result in further retaliatory action, document concealment, or procedural delays, and would defeat the purpose of emergency relief. Therefore, Plaintiff respectfully requests that the Court grant this Application on an expedited ex parte basis to preserve the status quo and prevent irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

1.  The issuance of an Emergency Ex Parte Temporary Restraining Order and a Preliminary Injunction ordering Columbia to:

    (a)    Allow Plaintiff to register for Summer II 2025 classes without penalty;

    (b)    Ability to complete the full program in August 2025 with degree conferral in October 2025;

    (c)    Remove the financial hold on Plaintiff's student account;

    (d)    To make sure Plaintiff maintains the HRSA Nurse Corp Scholarship;

    (e)    Reinstate Plaintiff's Fall 2025 admission in the DNP Midwifery program;

    (f)    Reinstate Plaintiff's disability reasonable accommodations and allow for the instatement of the other requested disability reasonable accommodations.

    (g)    Restore Plaintiff's "Excused" grade for the Integration course;

    (h)    Remove the "Low Pass" grade and the academic probation;

    (i)    To grant Plaintiff government oversight and protection;

    (j)    To reimburse Plaintiff for the Fall 2024 semester per HRSA guidelines;

2. To the extent still necessary and appropriate, a permanent injunction on the same grounds;

3. Compensatory, consequential, and punitive damages in amounts to be determined at trial;

4. Statutory penalties, including treble damages, for violations of General Business Law § 349(h) and N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

5. Reasonable fees, the cost of suit, and expenses;

6. Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

7. Such other relief as the Court deems just and proper.


Dated: June 12, 2025

Respectfully submitted,


/s/ Sescily R. Coney
Sescily R. Coney, Pro Se
300 Ft. Washington Ave., Apt. 1H
New York, NY 10032
Telephone: 856-873-4911